NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0451n.06

No. 14-3670

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 16, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| AARON VOLTZ, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ERIE COUNTY, *et al.*, | ) | COURT OF THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| Defendants-Appellees. | ) | |
| | ) | |

**BEFORE:** **KEITH, MERRITT, and BOGGS, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge.** This is an employment discrimination action in which Aaron Voltz, a Hispanic male, alleged that his former employer, Erie County Department of Job and Family Services ("JFS"), terminated and refused to rehire and reassign him due to his national origin and gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., Ohio Revised Code § 4112.02(A), and 42 U.S.C. § 1981, made applicable to Defendants under 42 U.S.C. § 1983. He also alleged a retaliation claim under Ohio Revised Code § 4112.02(I), which was voluntarily dismissed. Defendants moved for summary judgment that was granted by the district court. Citing *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), the district court dismissed the discrimination claims that asserted cat's paw liability. The district court also dismissed the claims that were based on disparate treatment. Finally, the district court held that Voltz was not entitled to "fallback," which is a process under Ohio law by which certain employees, if terminated, can request reinstatement to the position

No. 14-3670, *Voltz v. Erie County, et al.*

held immediately prior to termination, Ohio Revised Code § 329.02. Because we find no error in the decision of the district court to grant Defendants' motion for summary judgment, we **AFFIRM**.

## I. BACKGROUND

In 1996, Voltz began working for JFS. JFS is managed by an assistant director and a director. The assistant director is appointed by the director and approved by the Erie County Board of Commissioners (the "Board")[1], which consists of three elected officials. The assistant director reports to the director. The director is appointed by, and reports to, the Board.

Among other services, JFS offers child protection services that provide assistance to families if a report of child abuse or neglect is substantiated. The child protection services department is structured such that there is an Intake and Investigations Unit and a Children Services Unit. The Intake and Investigations Unit receives reports of child abuse and/or neglect and determines whether families have issues that put children at risk. Caseworkers who work in the Intake and Investigations Unit are referred to as "incoming" caseworkers. If risk is determined, the case is transferred to the Children Services Unit. A risk assessment and case plan are drawn to reduce the likelihood of abuse and/or neglect. JFS assigns "ongoing" caseworkers from the Children Services Unit to families to ensure that all are compliant with the plan.

Voltz was promoted by JFS from an entry-level "ongoing" caseworker position to director. With each promotion, Voltz received a raise except when he transitioned from interim

---

[1] The Board consists of three Commissioners. When acting in an official manner, we refer to the three as Commissioners. When acting as one entity, we refer to the Commissioners as the Board.

assistant director to assistant director. And, with most of the promotions, Voltz was selected over white female applicants. The Board that promoted Voltz to, and fired Voltz from, the position of director, as well as promoted him to interim and assistant director consisted of Thomas Ferrell, Jr., William Monaghan, and Patrick Shenigo. There is no dispute that Margaret Rudolph, who was the then-director of human resources, was on the committee that promoted Voltz to assistant director and director, and she recommended his termination from JFS to the Board. Because this dispute only concerns Voltz's employment as assistant director and director, we focus primarily on the facts relevant to those positions.

On May 4, 2009, Judy Englehart, the then-director, appointed Voltz to serve as interim assistant director. On December 9, 2010, after Voltz was promoted to interim assistant director, the Board received an anonymous complaint, which alleged that Voltz created a hostile work environment for those whom he supervised. The complaint stated that Voltz intimidated, terminated, and screamed at employees because he had a violent temper. The complaint further stated that employees were afraid to speak to Voltz, and pleaded for protection from the Board. The complaint also stated that Voltz drove his motorcycle under the influence of alcohol. This was not the first complaint filed against Voltz. On February 5, 2008, Voltz filed a complaint—in response to a complaint alleged against him—that stated that the then-union president had falsely accused him of mistreating employees because she disliked him due to his national origin and gender. Voltz's complaint was addressed to the then-assistant director. As to the 2010 complaint, Mike Bixler, who is the Erie County Administrator, and Commissioner Monaghan stated that it is the County's policy to discard anonymous complaints. However, due

to the severity of the allegations, Bixler recommended that JFS conduct an investigation. The Board asked Rudolph to investigate the complaint, and referred the matter to the Erie County Prosecutor's Office. On December 21, 2010, the Erie County's Prosecutor's Office assigned Paul Schnittker to investigate the complaint.

Notwithstanding the anonymous complaint, on December 28, 2010, Voltz's appointment to assistant director was made permanent by approval of the Board. Voltz was not offered a raise. Voltz testified that although he was granted a raise to serve as interim assistant director, his raise was less than that offered to white women. Therefore, Voltz asked Englehart for an additional raise after being promoted to assistant director. Englehart petitioned Rudolph for a salary increase on Voltz's behalf, but Rudolph denied her request. Voltz believes his national origin and gender motivated Rudolph's denial.

While Rudolph's and Schnittker's investigation was ongoing, around the middle of January 2011, Commissioner Shenigo was contacted by a reporter who advised that Voltz had been involved in a domestic dispute on New Year's Eve, which resulted in a police report being filed against him. Allegedly, Voltz was intoxicated and assaulted a woman. Voltz, however, said that he was in an unhealthy relationship, which often led to the alleged victim assaulting him. The reporter informed Commissioner Shenigo that he intended to run a story apprising the public of the events. Commissioner Shenigo requested that the article not be written, and immediately spoke to Voltz about the incident. Sometime thereafter, Bixler, Englehart, and Rudolph met with Voltz to discuss the incident. During this meeting, it was decided that Voltz would speak to the reporter. Voltz's deposition testimony says that he was concerned that being

4

a party to a serious police report would compromise his job, but that Bixler, Englehart, and Rudolph investigated the situation, allowed him to present his side, and assured him that his job was not in jeopardy. After these conversations, the reporter decided against running the article.

On January 27, 2011, Rudolph and Schnittker drafted a joint report that concluded that Voltz did not establish a hostile work environment at JFS. As part of their investigation, Rudolph and Schnittker spoke to: six current JFS employees, one former JFS employee, and a non-employee. All were asked the same questions. Both concluded that the employees' responses established only that Voltz had a "command presence." Rudolph and Schnittker summarized "command presence" in their joint report as "body language that conveys authority, confidence and respect . . . the direction of emotion into voice inflection, pitch and tone, hand gestures and eye contact that instills confidence and restores order." They noted that in a "non-law enforcement zone, such as an office setting, that command presence can in fact be very intimidating and could cause those around Mr. Voltz to have feelings of trepidation or concern for their continued employment." In response to employees' complaints that Voltz was not approachable, Rudolph encouraged employees to report employment issues to her. Voltz's deposition says that when Rudolph completed her investigation of the anonymous complaint against him, she advised him that "this command presence that I had was an issue, as the building was full of estrogen, and as a male, I was not going to survive."

After the report was finalized, Rudolph presented it to the Board. After reviewing the report, the Board held a conference with Bixler, Englehart, Rudolph, and a reporter. The Board announced that Voltz was absolved of any wrongdoing on New Year's Eve and that the

anonymous compliant was meritless. Rudolph's and Schnittker's report was referenced to support the conclusion.

On February 1, 2011, the reporter who was present at the conference ran a front-page article conveying that an anonymous complaint had been filed against Voltz, but that he was cleared of wrongdoing. Commissioner Monaghan supported Voltz, and was quoted in that article stating that "Voltz . . . look[s] out for the best interest of children . . . [and holds employees] accountable."

After Voltz's reputation was publically cleared, all continued to regard him as a potential director. Englehart was scheduled to retire, and on June 1, 2012, she did. Prior to her retirement, the Board sought to find her replacement. The Board formed a hiring committee, which consisted of Commissioner Monaghan, Bixler, and Rudolph. Voltz and nineteen others applied for the director position. Englehart recommended to the Board that Voltz replace her as director. The hiring committee interviewed Voltz, and unanimously recommended him as its selection. Voltz then interviewed a second time with the Board, Rudolph, and Bixler; he was extended an informal offer during the interview. Immediately after the informal offer was made, Commissioner Monaghan instructed Bixler and Rudolph to inform Voltz that "we could not have a replay of anything that had occurred previously and there was no second chance." Commissioners left the interview room. Voltz stayed behind with Bixler and Rudolph for a brief meeting.

The discussions during this meeting are disputed. Bixler's deposition says that during this meeting he spoke to Voltz about his behavior outside of work, specifically telling Voltz that he should not act in a manner that would draw negative publicity to JFS. Bixler states that he told Voltz that such behavior would not be tolerated as director. Rudolph's deposition says that she also told Voltz not to publically embarrass JFS.[2] Although Voltz was not specifically asked whether Bixler and Rudolph spoke to him about his behavior outside of work, Voltz did testify that he believed the New Year's Eve report and anonymous complaint impacted his chances of obtaining the director position. And, Voltz states that he thought JFS delayed and then expanded the pool of applicants in an effort to locate a more suitable candidate.

As Voltz was leaving the meeting with Bixler and Rudolph, Voltz and Commissioner Monaghan spoke. Commissioner Monaghan's deposition says that he personally told Voltz not to "blow" the opportunity to serve as director; the two then discussed salary. Voltz's deposition confirms that he spoke to Commissioner Monaghan, but only briefly about his salary.

On June 9, 2012, Voltz was formally offered the position of director. The offer letter required Voltz to serve a 180-day probationary period and be evaluated at least twice during the probationary period. The offer letter also referenced salary; it said that compensation may be reevaluated to reflect additional job duties should Voltz continue to perform the duties of assistant director.

A month later and while on probation, Voltz was arrested on a rape charge. On the day of Voltz's arrest, Rudolph received a call from her sister, a former assistant prosecutor. Her sister informed her that Voltz had been arrested and was currently in jail on a rape charge.

---

[2] Voltz's deposition says that the three discussed salary and formalizing acceptance of

Rudolph inquired as to whether the alleged rape involved a JFS employee; her sister replied no, but refused to identify the alleged victim. While on the phone with her sister, Bixler phoned but Rudolph did not answer. After Rudolph finished speaking with her sister, she called Bixler. Bixler, too, informed Rudolph that Voltz was in jail on a rape charge. They decided that Bixler would contact Commissioners to schedule a closed board meeting to discuss Voltz's employment. Shortly after speaking with Bixler, Sherriff Lyons called Rudolph. Sherriff Lyons also informed Rudolph that Voltz had been arrested on a rape charge.

The next day, Bixler confirmed that a closed board meeting would be convened to discuss Voltz's employment later that morning. Only Commissioners, Rudolph, Bixler, Lyons, and the County Clerk were invited to attend the closed meeting. Rudolph and Bixler recommended that Voltz be terminated, and the Board agreed. Voltz was neither invited nor present at the meeting. Voltz was not given the opportunity to present his version of events, which was that: Voltz and his then-girlfriend had been out drinking. An argument between the two ensued. Voltz left, and decided to spend the remainder of the evening with his ex-girlfriend. He and his ex-girlfriend had sex. Afterwards, Voltz began texting his then-girlfriend. His ex-girlfriend discovered the text messages, and alleged that he raped her. The same ex-girlfriend had alleged that he raped her before. Voltz continued to have sex with her under duress, because she threatened to destroy his career if he did not.

After his termination, a newspaper published an article in which the alleged victim recanted the rape allegation. The article also disclosed that she had asked the prosecutor to drop the charge against Voltz. Subsequently, the district attorney dismissed the rape charge because

JFS's offer; Rudolph instructed him that the salary was not negotiable.

the alleged victim recanted. Voltz then applied for the director position. Rudolph sorted Voltz's application out and did not pass it on to others. The Board did not consider his application; it hired the white woman who served as the interim director after Voltz's termination. More than a year after Voltz was terminated, Voltz wrote the Board requesting reinstatement to the position of assistant director under Ohio's fallback provision. The Board denied Voltz's request.

Voltz filed a complaint in federal court against Erie County, the Board, and JFS (collectively "Defendants"). Defendants moved for summary judgment on all claims, which was granted. Voltz filed this appeal.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*. *Laster v. City of Kalamazoo,* 746 F.3d 714, 726 (6th Cir. 2014). Under Federal R. of Civil P. 56(a), summary judgment is proper if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to "inform[] the district court of the basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant need not support its motion with affidavits or similar materials. *Id.* "After the moving party has met its burden, the burden shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[I]f the

nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which the nonmovant has the burden, the moving party is entitled to summary judgment as a matter of law." *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001).

### III. DISCUSSION

#### A. Voltz's Title VII, O.R.C. § 4112, and § 1983 Claims

Voltz maintains that the district court erred in dismissing his Title VII, Ohio law, and § 1983 discrimination claims. Title VII makes it "unlawful . . . for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1), as does Ohio law. O.R.C. § 4112.02. The Ohio Supreme Court holds that "federal case law interpreting Title VII . . . generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Ohio Civil Rights Comm'n v. David Richard Ingram, D.C., Inc*., 69 Ohio St. 3d 89, 1994 Ohio 515, 630 N.E.2d 669, 672 (Ohio 1994). Likewise, in order to prevail on a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983, a plaintiff must prove the same elements required to establish a disparate treatment claim under Title VII of the Civil Rights Act of 1964. *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000). Therefore, we analyze all claims under Title VII's rubric.

Voltz makes two primary arguments in support of his employment discrimination claims on appeal. Voltz maintains that because JFS relied on Rudolph's recommendation to terminate him, her discriminatory animus is imputed to it under the cat's paw theory of liability. In the alternative, Voltz asserts that circumstantial evidence shows that JFS terminated and refused to

10

No. 14-3670, *Voltz v. Erie County, et al.*

rehire and reassign him due to his national origin and gender.  We address each in turn.

### 1.    Cat's Paw

The district court held that cat's paw was not applicable because Rudolph was not Voltz's supervisor.  This was error.  The cat's paw theory of liability is relatively new and seeks to hold an employer liable under Title VII for an employment decision if such decision is motivated by discriminatory animus.  *See Staub*, 562 U.S. at 415 n.1 (citing *Shager v. Upjohn Co*., 913 F.2d 398, 405 (7th Cir. 1990) as the pioneer of the theory).  Although the full extent of the application of cat's paw is unsettled, in *Staub* the Supreme Court answered the question of whether animus can be aggregated to impose liability on an employer that made an impartial decision to terminate employment based on the discriminatory animus of a supervisor who influenced—but did not make—the decision to terminate.  *Id.* at 1189.  Applying principles of agency and tort law, *Staub* held that cat's paw liability is applicable and imposes employer liability "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action." *Id.* at 1194 (footnote omitted).[3]   However, "if the employer's [independent] investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable." *Id.* at 1193.

---

[3] Voltz agreed to the dismissal of his retaliation claims, and for that reason any argument with respect to retaliation fails.  We do note that while our understanding of *Staub* was developing, the Supreme Court established that Title VII retaliation claims require but-for causation: "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).  In *Seoane-Vazquez v. Ohio State Univ*., 577 Fed. App'x. 418 (6th Cir. 2014), we applied the "but-for" standard.  However, we continue to apply the "motivating factor" standard to claims of discriminatory discipline and failure to rehire and reassign claims.

No. 14-3670, *Voltz v. Erie County, et al.*

We recently extended the application of cat's paw liability to impute liability to an employer for the discriminatory actions of a human resources director. *Chattman v. Toho Tenax America, Inc.,* 686 F.3d 339 (6th Cir. 2012). Then, we reinforced that the most probative factor of the cat's paw analysis when determining whether an employee is one whose animus may be imputed to an employer is the "employee's ability to influence the ultimate decisionmaker." *Chattman,* 686 F.3d at 353 (citing *Ercegovich*, 154 F.3d at 355 (6th Cir. 1998) (holding that a biased employee's "position [of] influence" is probative of that employee's ability to influence the ultimate decisionmaker)). *Chattman* reasoned that if a "plaintiff can show discrimination by offering evidence of a causal nexus between the ultimate decision maker's decision to discipline the plaintiff and [a] supervisor's discriminatory animus," he may prevail under cat's paw liability. *Id.* at 350.

Our extension of cat's paw liability is reinforced by the Supreme Court's decision in *Vance v. Ball State University*, 133 S. Ct. 2434 (2013). *Vance* is a Title VII harassment case in which the court held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* at 2439. The ability to take "tangible employment actions" means that the individual can "effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 2443 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

12

No. 14-3670, *Voltz v. Erie County, et al.*

These holdings force a conclusion that if Rudolph exhibited discriminatory animus, such animus could be imputed to JFS under cat's paw. Rudolph: (1) interviewed and hired candidates for JFS; (2) determined salary increases; and (3) made recommendations regarding whether to terminate employees. Indeed, Rudolph had the authority to, and did in fact, influence decisions to hire and terminate Voltz. Rudolph "doubtlessly . . . [had] authority over personnel decisions[,]" *Chattman*, 686 F.3d 353, and the ability to "take tangible employment actions." *Vance*, 133 S. Ct. at 2443.

While it was error for the district court to conclude that cat's paw was inapplicable, we take no issue with the district court's dismissal of this claim. As a predicate to cat's paw, Voltz was required to establish that the record supports discriminatory animus. *See Staub*, 131 S. Ct. at 1194. An employer's liability under *Staub* extends only to a non-decisionmaker's act that is motivated by discriminatory animus and intended to cause an adverse employment action. *Id.* "[E]vidence of animus is difficult to demonstrate." *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 F. App'x. 620, 626 (6th Cir. 2010). "Discriminatory animus . . . requires a showing of prejudice, spite, or ill will." *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012); see also *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472-73 & n.7 (11th Cir. 1999) (defining "racial animus" as "ill will, enmity, or hostility"). This claim fails due to the absence of discriminatory animus.

The four arguments that Voltz raises do not produce even the slightest inference that could support a finding that Rudolph exhibited discriminatory animus towards him due to his national origin and gender. Although Voltz argues that discriminatory animus exists because

13

Rudolph investigated the anonymous complaint against County policy and reported that his "command presence" was an issue in a building "full of estrogen . . . as a male, he was not going to survive," it falls short of spite. First, Rudolph did not recommend that there be an investigation of the anonymous complaint; Bixler did. And, Bixler assigned Rudolph to conduct the investigation. Furthermore, Rudolph's impartial investigation is not tainted by one off-hand comment. *See Lautermilch v. Findlay City Schs*, 314 F.3d 271, 276 (6th Cir. 2003) (holding that employer's isolated statement that plaintiff was "too macho" did not create a triable issue on discrimination because, in context, a reasonable fact-finder would conclude that the comment was critical of the plaintiff's behavior, not sex or gender). At best, Rudolph offered a sound recommendation as to how to deal with subordinates who conveyed that they worked in fear. Voltz's next argument in support of discriminatory animus, which is grounded in Rudolph's denial of his request for a salary increase, also fails. Voltz says that Englehart told him that Rudolph declined to increase his salary because she did not want a man to make more money than she did. Voltz's deposition, however, states that Englehart did not specifically say that Rudolph told her that Rudolph did not want a man to make more money than she. In fact, Rudolph did not deny Voltz's raise; she had already granted a raise when he assumed the duties of assistant director in the interim. Rudolph's failure to provide an additional raise for the same promotion does not establish discriminatory animus. Voltz's argument that Rudolph failed to investigate the complaint that he filed, alleging that he was treated improperly due to his national origin and gender, does not establish discriminatory animus. Rudolph could not have ignored Voltz's complaint because it was not addressed to her. The complaint was filed with the then-

14

assistant director. Finally, Voltz's assertion that Rudolph's failure to suggest alternative discipline is evidence of animus, also fails. Rudolph was not required to suggest alternative discipline of a probationary employee who had twice subjected JFS to negative publicity. We simply find no basis on which a jury could determine that Rudolph exhibited "intentionally differential treatment and a disdainful motive for acting that way." *Liese*, 701 F.3d at 344.

The record establishes that Rudolph supported Voltz and his upwards trajectory at JFS. After learning that there was a police report that said Voltz was involved in a domestic dispute, Rudolph accompanied Voltz as he spoke to a reporter about the alleged incident to establish his innocence. Rudolph investigated the anonymous complaint in an impartial manner and drafted a report exonerating Voltz of any wrongdoing. Additionally, the report that Rudolph drafted that summarized her investigation was provided to the reporter in support of Voltz, which conveyed that Voltz had character worthy of praise. Furthermore, Rudolph recommended that the Board hire Voltz as director over white women. *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995) ("[T]he 'same actor' inference . . . allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee.").

We, therefore, find that it was not error for the district court to dismiss Voltz's cat's paw claim, as he failed to establish discriminatory animus. *See Freeze v. City of Decherd*, 753 F.3d 661, 664 (6th Cir. 2014) ("Appellate courts reviewing grants of summary judgment may affirm on any grounds supported by the record.").

15

### 2. Disparate Treatment Based on Disciplinary Action and Refusal to Rehire and Reassign

To prevail on a Title VII claim under the burden-shifting framework based on disciplinary action, a plaintiff must show that: (1) he is a member of a protected class; (2) that he suffered an adverse action; (3) he was qualified for the position; and (4) despite being qualified, he was treated differently from similarly situated members of an unprotected class. *Chattman*, 686 F.3d at 347. A refusal to rehire and reassign claim is, likewise, examined under the burden-shifting framework, and to state a *prima facie* claim a plaintiff must show that he: "(1) is a member of a protected class; (2) applied for a job and did not receive it; (3) was qualified for the job; and (4) was rejected in favor of a similarly situated applicant outside h[is] protected class, or was otherwise treated differently than such an applicant." *Jenkins v. Foot Locker Inc.*, 598 F. App'x 346, 349 (6th Cir. 2015) (citing *Seay*, 339 F.3d at 463).

We need not determine whether Voltz established a *prima facie* case of discrimination because JFS has come forth with an identical legitimate, nondiscriminatory reason for Voltz's termination and refusal to rehire and reassign: a day prior to Voltz's termination he was arrested on a rape charge that would reasonably be made public and negatively impact JFS.

If an employer demonstrates a legitimate nondiscriminatory reason for an adverse employment action, a plaintiff can only prevail should he establish pretext. *McDonnell Douglas*, 411 U.S. at 802. Pretext is demonstrated by showing that the employer's proffered reason: "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.

16

2000)). The first category requires evidence "that the proffered bases for the plaintiff's discharge never happened." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The second category requires that the plaintiff "admit[] the factual basis underlying the employer's proffered explanation and further admit[] that such conduct could motivate dismissal" but prove that the illegal motivation actually led to the action. *Id.* The third category requires evidence that other employees outside the protected class were not similarly disciplined even though they engaged in substantially identical conduct to that which motivated the decision to discipline a plaintiff. *Id.*

No reasonable juror could find that any of the four reasons that Voltz provides establishes that JFS terminated and failed to rehire and reassign Voltz as pretext for discrimination due to his national origin and gender.[4] While Voltz correctly asserts that inconsistent justification for termination may support a finding of pretext, we have held that differences that do not suggest actual inconsistency in the decision maker's justifications do not establish pretext. *See Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 269 (6th Cir. 2010). Here, each proffered reason is based on the same incident and fixed in the same justification: his arrest for rape and JFS's image. Further, Voltz's assertion that his termination is a deviation from JFS's own policy is insufficient to establish pretext. Defendants correctly argue that Voltz was an at-will probationary employee who was not entitled to a hearing. Moreover, to the extent that Voltz maintains that JFS's justification for terminating him is unwarranted because other employees engaged in publicized misbehavior, it is a miss. Unlike any other employee Voltz's termination

---

[4] Below, Voltz argued and the district court decided that evidence of post-hoc behavior did not establish pretext. Voltz does not argue that the district court erred, so we consider the argument waived.

was not solely linked to negative publicity; it was linked to his escalating behavior, which cast JFS negatively. By Voltz's own admission, he knew that being accused of a domestic dispute put his employment as director in a precarious position. Because a rape arrest is more extreme than the domestic dispute complaint, even by Voltz's standard he should have known that his job as director would be compromised.

Voltz's final argument that other employees, particularly employees outside of his protected class, were not disciplined even though they engaged in substantially identical conduct to that which JFS contends motivated its discipline of him, is likewise insufficient to establish pretext. Generally, to be considered similarly situated, employees "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citations omitted). In cases where the same-supervisor is improbable or the job is unique, to be similarly situated, we require only "similar[ity] in all of the relevant aspects" of employment. *Seay v. TVA*, 339 F.3d 454, 480 (6th Cir. 2003); see also *Chattman*, 686 F.3d at 348 (quoting *Ercegovich*, 154 F.3d at 352). The "relevant aspects" vary depending on the circumstances. *Ercegovich*, 154 F.3d at 352 ("Courts should not assume, however, that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee.").

None of the employees who Voltz identifies is identical to him, i.e., a director who had been arrested on a rape charge and engaged in prior conduct that could have cast JFS in a negative light. Most pertinent are: a white male caseworker who was terminated after an investigation substantiated that he had solicited sex from families in exchange for favorable reports and a white male former human resources director who was allowed to resign after JFS discovered that he viewed pornography on his work computer. But, Voltz fails to explain how an entry-level caseworker who solicited sex or a director of a single department is "similar in all relevant aspects." *See Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994) (finding that employees are not similarly situated to supervisors). Voltz was the director of the *entire* organization; he was essentially the "face" of JFS. Importantly, neither the caseworker nor the former director of human resources had engaged in prior conduct that led to police involvement and could have exposed JFS to negative publicity. Therefore, we uphold the district court's decision that none of the employees who Voltz identified is similarly situated to him.

Accordingly, the district court did not err in dismissing these claims as no reasonable juror could find that existence of pretext under the burden-shifting framework.

### B.     Fallback Rights

The County Department of Jobs and Family Services is governed by O.R.C. § 329.02, which determines the "[p]owers and duties of director." O.R.C. § 329.02 provides that "[e]ach director appointed on or after October 5, 1987, shall be in the unclassified civil service and serve at the pleasure of the board." It further states that "[i]f a person holding a classified position in the department is appointed as director . . . and is later removed by the board . . . the person so

19

removed has the right to resume the position the person held in the classified service immediately prior to being appointed as director." *Id.* This ensures that employers do not place classified employees in unclassified positions to summarily terminate them. Therefore, Voltz's right to reinstatement turns on whether the assistant director is a classified position under Ohio law. Because the record supports that the position of assistant director is an appointed position, it is unclassified. Voltz was selected by the director to be the assistant director. However, Voltz did not become the assistant director of JFS until the Board voted to appoint him to the position. Further, JFS submitted evidence that the assistant director position was unclassified when Voltz was appointed to, and terminated from, the position of director. Thus, Voltz has no classified position to fallback to. Accordingly, the district court did not err in dismissing Voltz's fallback claim.

## IV. CONCLUSION

Accordingly, and for the above-stated reasons, we **AFFIRM** the decision of the district court, which granted Defendants' motion for summary judgment.