RENDELL, Circuit Judge,
concurring in part and dissenting in part.
Four years ago in Vance v. Ball State University, — U.S. -, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013), the' Supreme Court set forth a clear and straightforward test for determining whether an employee ought to be considered a “supervisor” for purposes of the employer’s vicarious liability for sexual harassment in the workplace under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). The Majority’s decision to deem Marshall a “supervisor” and allow Moody’s hostile work environment claim to move forward totally ignores, and is inconsistent with, this recent pronouncement. For that reason, I respectfully dissent.[1] ■
I. “Supervisor” Before Vance
The Supreme Court first attached significance to the “supervisor” label in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In those cases, the Supreme Court held that an employer will be held vicariously liable for its employees who engage in discrimination such as sexual harassment, even in the absence of negligence, if the harasser was a “supervisor” who took a “tangible employment action” against the victim. See Ellerth, 524 U.S. at 762, 118 S.Ct. 2257; Faragher, 524 U.S. at 790, 118 S.Ct. 2275. These cases defined a “tangible employment action” as a “significant change in employment status, such as *222 hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.” Ellerth, 524 U.S. at 761, 118 S.Ct. 2257. They explained that “[a] tangible employment decision requires an official act of the enterprise, a company act[,]” which “in most cases is documented in official company records, and may be subject to review by higher level supervisors.” Id. at 762, 118 S.Ct. 2257.
Although Ellerth and Faragher confirmed the significance of supervisor status for Title VII claims, they left the term “supervisor” undefined.[2] This lack of guidance led to a circuit split. Some courts interpreted the case law to “presuppose[ ] a clear distinction between supervisors and co-workers” that focused on such discrete responsibilities as hiring/firing, promoting/demoting, transferring, and disciplining, while others followed the “open-ended approach advocated by the EEOC’s Enforcement Guidance, which tie[d] supervisor status to the ability to exercise significant direction over another’s daily work.” See Vance, 133 S.Ct. at 2443 (contrasting the former approach taken by the First, Seventh, and Eighth circuits with the latter approach taken by the Second and Fourth circuits). The EEOC’s Enforcement Guidance set forth vague qualitative and quantitative guidelines:
[A]n employee, in order to be classified as a supervisor, must wield authority of sufficient magnitude so as to assist the harasser explicitly or implicitly in carrying out the harassment.... [T]he authority must exceed both an ill-defined temporal requirement (it must be more than occasional!]) and an ill-defined substantive requirement (an employee who directs only a limited number of tasks or assignments for another employee ... would not have sufficient authority to qualify as a supervisor^) ].
Id. at 2449 (citations and internal quotation marks omitted) (third alteration in original). Courts adopting the EEOC’s Enforcement Guidance thus considered “the number (and perhaps the importance) of the tasks in question [as] a factor to be considered in determining whether an employee qualifies as a supervisor.” Id. at 2450. In Vance, the Supreme Court noted that this approach resulted in a “standard of remarkable ambiguity” given that “[k]ey components of that standard—‘sufficient’ authority, authority to assign more than a ‘limited number of tasks,’ and authority that is exercised more than ‘occasionally’— have no clear meaning.” Id.
Prompted by the deepening divide among the circuits and the myriad variations that the label “supervisor” had come to connote depending on the context,[3] *223 Vance finally addressed the “supervisor” question.
II. Vance v. Ball State University
Writing for the majority in Vance, Justice Alito made it quite clear that the Supreme Court was announcing a new, “readily applied” test for determining whether one is a “supervisor” for purposes of hostile work environment claims brought under Title VII. Id. at 2449. The case marked a shift in analysis away from the “nebulous definition,” id. at 2443, or “study in ambiguity,” id. at 2449, that had previously applied. No longer is there an assortment of “varying meanings” that can be considered, id. at 2446, or “a highly ease-specific evaluation of numerous factors” in which courts ought to engage, id. at 2443. Rather, the newly streamlined test is whether the person in question has the authority—“empowered by the employer”—to alter the employee’s status. Id. at 2439. Courts are now charged with asking whether the employee in question is capable of taking one of several discrete actions toward the employee: Can that person hire or fire the employee? Can that person promote or demote the employee? Can that person reassign the employee with significantly different responsibilities or make a decision that eauses a significant change in the employee’s benefits? If none of these questions can “readily” be answered in the affirmative, then the inquiry ends and the reviewing court may not deem that employee a “supervisor.” This bright-line approach fosters an “easily workable” definition that “can be applied without undue difficulty at both the summary judgment stage and at trial.” Id. at 2444 (also observing that “[t]he alternative, in many cases, would frustrate judges and confound jurors”).[4]
III. Marshall Is Not a “Supervisor” Under Vance
Turning to our case, I would have applied the unambiguous test that Vance established rather than the Majority’s open-ended, multi-factor approach that Vance explicitly rejected. Could Marshall hire or fire Moody? Could Marshall promote or demote Moody? Could Marshall reassign Moody with significantly different responsibilities or make a decision that caused a significant change in her benefits? The record undoubtedly answers all of these questions in the negative.
The Majority primarily argues that Marshall was Moody’s “supervisor” because he could cause a significant change in Moody’s benefits by virtue of his ability to assign her hours and his record of assigning her a significant number of hours. The *224 Majority relatedly urges that Marshall’s supervisory status also stems from his-ability “to determine whether Moody worked at all” at the New York Avenue School. Maj. Op. at 217. But as the record and relevant case law demonstrate, neither characterization of Marshall’s responsibilities is enough to render Marshall a “supervisor” under Vance. I will address each one in turn.
A.
The Majority contends that because Marshall impacted Moody’s “benefits”— ie., her pay by virtue of giving, or not giving, work—he was her “supervisor.” Id. Due to the number of hours he assigned her (and then ultimately did not assign her), the argument goes, this impact was “significant” so as to make Marshall’s assignment of work fit within the last phrase of the Ellerth description of tangible employment actions—a decision that causes a “significant change in benefits.” Id. at 217 (citation omitted); see also id. at. 217 (“Marshall assigned Moody over 70% of her hours from October 2012 through February 2013”). This contention, and the'approach it rests on, squarely contradicts Vance, as Moody was not entitled to any “benefits” that could be “change[d].”
The Majority rightly notes' that as á substitute custodian, Moody “was not guaranteed any work.” Id. at 210. Moody well understood what her position entailed, as she testified in her deposition that she was never entitled to a minimum number of days of work per week, fixed tenure, raise in salary, promotion to full-time custodian, or any additional benefits. (See. A. 206-09.) Indeed, when she wanted more assignments, Moody knew she needed to take the initiative to introduce herself to the foremen and make it known that she was available. Moody’s arrangement with the Board is dispositive of the supervisor question, as the benefits "to which she was entitled constitute our starting point for assessing whether there was a “significant change.” But as Moody testified, there were no benefits to which she was entitled.
“Significant change in benefits,” placed as it is in Ellerth as the last phrase follovv-ing such discrete capabilities as hiring and firing, see 524 U.S. at 761, 118 S.Ct. 2257, must involve a change in some specific aspect of employment that has already been contracted for or is reasonably expected, such as take-home pay, vacation days, health coverage, and the like. Moody was not entitled to, nor had any expectation of, any of these types of benefits, and Marshall did not have any authority to provide them, let alone alter them. While he could assign her work, as could the other ten’foremen, Vance rejected that capability as part of a nebulous supervisor calculus. See Vance, 133 S.Ct. at 2445-46 (citing 5 C.F.R. § 9701.212(b)(4) as an example that in some legal contexts, “supervisory work .:. may involve hiring or selecting employees” ’ and “assigning work,” and noting that “the term ‘supervisor’ has varying meanings both in colloquial usage and in the law” and that therefore a streamlined definition was necessary for Title VII purposes).
Furthermore, if impacting pay by giving or not giving'work elevates'an employee to supervisor status, every person in charge of the weekly roster for hourly workers such as waiters, nurses, truckers, and the like will be supervisors if they sufficiently favor, or disfavor, certain of those workers. And such a purported “supervisor” would not be a “supervisor” of those employees whose hours were not significantly impacted. The analysis espoused by the Majority today would have courts engage in a rigorous fact-checking of payroll records and then .not only calculate the total number of hours worked but also identify and con *225 trast patterns of those hours over time and among employees.[5] Such an undertaking is precisely the sort of “highly case-specific evaluation” that Vance eliminated. Even- if we were permitted to engage in that sort of inquiry, the Majority’s conclusion would still be erroneous because Marshall’s responsibilities do not take on greater weight—and, by extension, do not render him . a “supervisor”—simply because Moody happened to. be more successful with him than with other foremen in securing work. Marshall’s responsibilities are defined at the front-end by the terms set by the employer, which in this case, simply did not task Marshall with a supervisory role as contemplated by Vance.
Marshall’s assignment of hours, and its impact on Moody’s pay, is only noteworthy because Moody was a wage employee and not a salaried one. The few courts of appeals to address the “supervisor” question have noted this distinction—wage.employee as opposed to salaried—but then have rejected the idea that influencing hours and pay in this way could render an employee a “supervisor.” See EEOC v. Autozone, Inc., No. 16-6387, 692 Fed.Appx. 280, 282-85, 2017 WL 2506526, at *2-3 (6th Cir. June 9, 2017) (implying that victim was an hourly employee but still finding that harasser was not her “supervisor” because he could not fire, demote, promote, or transfer, and noting that “Vance establishes a sharp line between co-workers and supervisors, not an invitation for speculation about amorphous levels of influence”)-(citation and internal quotation marks omitted); Chavez-Acosta v. Sw. Cheese Co., LLC, 610 Fed.Appx. 722, 730 (10th Cir. 2015) (holding that an employee was not a “supervisor” because he could not effect “significant change” in the victim’s employment even though he was a “team leader” in the department in which the victim worked and even though the victim was an hourly employee); McCafferty v. Preiss Enters., Inc., 534 Fed.Appx. 726, 728, 731 (10th Cir. 2013) (finding no “supervisor” status for an employee who oversaw and assigned work to McDonald’s crewmembers ' and noting that “[i]f mere influence in tangible employment decisions rendered a co-worker a supervisor, this exception would swallow the rule”).
Other courts of appeals have likewise found supervisor status to be lacking when reviewing responsibilities similar to those assigned to Marshall. See Kim v. Coach, Inc., No. 14-16248, 692 Fed.Appx. 478, 479, 2017 WL 2615457, at *1 (9th Cir. June 16, 2017) (finding no supervisor status for employee who could give instructions about work); Matherne v. Ruba Mgmt., 624 Fed.Appx. 835, 840 (5th Cir. 2015) (finding no supervisor status for employee who had some leadership authority, including control over a book where managers would make comments if anything went wrong in the workplace, but could- not hire, fire, promote, demote, transfer, or discipline); Spencer v. Schmidt Elec. Co., 676 Fed.Appx. 442, 447-48 (5th Cir. 2014) (finding no supervisor status for employee who could - give other employees direction on how to do their jobs but could not fire anyone - without permission, and noting that “evidence ... that a foreman was authorized to direct the employee’s daily *226 work activities ... is the definition of supervisor expressly rejected by the Supreme Court”) (internal quotation marks omitted). Conversely, courts have found that an employee qualifies as a supervisor when empowered to take the sorts of actions that Marshall could not. See Voltz v. Erie Cty., 617 Fed.Appx. 417, 424 (6th Cir. 2015) (employee who could interview and hire candidates, determine salary increases, and make recommendations regarding employee terminations was a “supervisor”). The only case that the Majority cites to support its elastic definition of “supervisor” as encompassing reducing another’s hours, Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227 (11th Cir. 2006), was decided over seven years before Vance and focused on “highly case-specific” factors that Vance explicitly rejected. See Vance, 133 S.Ct. at 2443 (rejecting the notion that one who “ha[s] the ability to direct a co-worker’s labor to some ill-defined degree” may properly be considered a “supervisor”).
B.
The Majority relatedly contends that Marshall had the authority to determine “whether Moody worked at all” at the New York Avenue School. Maj. Op. at 217. Relying solely on Cotton, this line of argument urges that “Marshall had the authority to cause a significant change in benefits by assigning her no hours, thereby eliminating her take-home pay.” Id. But such a characterization, insinuating that Moody’s fate as a Board employee was entirely up to Marshall, blatantly ignores the fact that Marshall had no control whatsoever over Moody’s ability to work at the ten other schools, and that she was only prohibited from working at the New York Avenue School after other Board employees told her to have no further contact with Marshall following her internal complaint.
Seeking to portray Marshall as the ultimate decision-maker of Moody’s work status, the Majority states that “no one else was identified in the record as having authority over Moody, other than the custodial foremen who could assign her work at their schools.” Id. Such a gap in the record would prove nothing regarding Marshall’s authority over Moody—the issue disposi-tive to Moody’s hostile work environment claim. This description of the record is also wrong. For example, Moody’s deposition indicates the presence of at least one other Board employee at the New York Avenue School whose authority over her was superior to Marshall’s. Moody testified to the effect that Marshall was not in charge at the New York Avenue School during the time that Moody worked there. The relevant exchange occurred during questioning regarding Moody’s description of Marshall grabbing her in a school stairwell to kiss her:
Q Did you discuss your discomfort with anyone?
A. No.
Q. So you didn’t tell the building supervisor, like the building pñncipal?
A. No.
Q. Mr. Marshall’s supervisor?
A. No.
Q. How about the police?
A. No.
(A. 212 (emphasis added).) This exchange suggests that there was someone else stationed at the New York Avenue School to whom Moody reported and who had supervisory authority over her. The record also identifies the Board employees who hired Moody and who therefore were her supervisors under Vance.[6] These examples from *227 the record seriously undermine the Majority’s notion that “no one else” had “authority over Moody.”
The Majority’s reasoning further-suffers from the absence of any limiting principle that the Supreme Court in Vance was so determined to impose in employment cases like this one. The Majority reasons on the one hand that Marshall’s ability to put together Moody’s schedule at the New York Avenue School rendered him her “supervisor” and, on the other hand, that “not ... every employee tasked with creating a work schedule is a supervisor for Title VII ... purposes.” Maj. Op. at 217 n.16. But the Majority fails to explain—let alone cite any supporting legal authority—why we ought to set aside the dictates of Vance and find that “creating a work schedule” is sufficient in this case. This omission is particularly glaring because the three other factors relied upon by the Majority— the Board’s so-called “concession” of Marshall’s status;[7] the record’s “failure” to identify an alternative supervisor; and the Majority’s analysis of Moody’s payroll records—do not make the case for deeming Marshall a “supervisor.”
All Marshall could do vis-a-vis Moody was schedule her hours at one out of the eleven schools at which she was qualified to work. If that alone, as the Majority concedes, is insufficient to render an employee a “supervisor,” how can Marshall possibly be Moody’s “supervisor” as defined by Vance? The gloss that'the Majority seeks to put on Marshall’s (limited) responsibilities is wholly belied by the
facts of the record and the requirements of the law.
IV. Conclusion
Whether or not we agree with the narrowed definition of “supervisor” set forth in Vance that will necessarily eliminate some employees’ claims against employers for hostile or harassing conduct, we are bound to follow the Supreme Court’s renunciation of the idea that one who assigns work is a supervisor:
Particularly in modern organizations that have abandoned a highly hierarchical management structure, it is common for employees to have overlapping authority with respect to the assignment of work tasks. Members of a team may each have the responsibility for taking the lead with respect to a particular aspect of the work and thus may have the responsibility to direct each other in that area of responsibility.
Vance, 133 S.Ct. at 2452. In making this statement, Vance was responding to—and rejecting—the dissenting justices’ observation, now adopted by the Majority in this case, that “individuals with the power to assign daily tasks are often regarded by other employees as supervisors.” Id. Even if that perception exists, it is not the law for purposes of Title VII. The Supreme Court has now held that the responsibility to direct others does not make an employee a “supervisor,” and this ruling dictates that Marshall was not Moody’s “supervisor.” [8]
*228 Our limited role for purposes of this appeal is not to figure out precisely who at the Board had supervisory power over Moody. We need only address whether Marshall did in order to allow Moody’s hostile work environment claim to proceed. It is clear to me, with Vance as binding precedent, that he did not. The Majority’s conclusion to the contrary is simply incorrect.

. In both Ellerth and Faragher, the status of the alleged harasser was not in dispute and so the Supreme Court did not need to reason through this issue. See Vance, 133 S.Ct. at 2447 (“In light of the parties’ undisputed characterization of the alleged harassers, this Court simply was not presented with the question of the degree of authority that an employee must have in order to be classified as a supervisor.”).

. See Vance, 133 S.Ct. at 2444 ("A comparison of the definitions provided by two colloquial business authorities illustrates the term's imprecision in general usage. One says that '[s]upervisors are usually authorized to recommend and/or effect hiring, disciplining, promoting, punishing, rewarding, and other associated activities regarding the employees in their departments.’ Another says exactly the opposite: ‘A supervisor generally does not have the power to hire or fire employees or to promote them.’ ... If we look beyond general usage to the meaning of the term in other legal contexts, we find much the same situation. Sometimes the term is reserved for those in the upper echelons of the management hierarchy. ... But sometimes the term is used to refer to lower[-]ranking individuals.”) (citation and footnotes omitted) (alteration in original).

. Clarifying Ellerth and Faragher, Justice Alito stated:
Those decisions contemplate a unitary category of supervisors, i.e., those employees with the authority to make tangible employment decisions. There is no hint in either decision that the Court had in mind two categories of supervisors: first, those who have such authority and, second, those who, although lacking this power, nevertheless have the ability to direct a co-worker’s labor to some ill-defined degree. On the contrary, the Ellerth/Faragher framework is one under which supervisory status can usually be readily determined, generally by written documentation.
Id. at 2443. Ellerth held that "[tjangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates.” 524 U.S. at 762, 118 S.Ct. 2257. Elucidating this statement, Vance rejected the "open-ended approach” and held that "[t]he strong implication of this passage is that the authority to take tangible employment actions is the defining characteristic of a supervisor, not simply a characteristic of a subset of an ill-defined class of employees who qualify as supervisors.” 133 S.Ct. at 2448.

. The Majority aims to downplay its rigorous examination of the record (and, more specifically, its reliance on the payroll records), by stating that it is “simply using the records to corroborate the conclusion that Marshall controlled a sizeable amount of Moody’s work, and hence her compensation-—the benefit she received from her employment.” Maj. Op. at ,217 n.15. This understatement is puzzling, as "the Majority’s conclusion that the impact of Marshall’s assignments on' Moody’s take-home pay rendered him a "supervisor” is necessarily drawn from and dependent on an analysis of these very records.

. Though the Majority emphasizes that Vance did not preclude the possibility of multiple *227 supervisors, that lack of explicit preclusion says nothing about whether Marshall himself enjoyed supervisory power over Moody.

. The Board's remark during oral argument that Marshall was acting in a supervisory capacity when Moody worked at the New York Avenue School only evinces the Board’s own misunderstanding of the concept of "supervisor.”

. I echo Justice Alito’s remark in Vance that victims of sexual harassment perpetrated by employees not considered "supervisors” may still pursue other related claims under Title VII, including negligence and quid pro quo (a claim that Moody’s counsel inexplicably dropped at oral argument). See 133 S.Ct. at 2452, The Majority's conclusion that my application of Vance to Moody’s claim would *228 preclude similarly situated employees from protection against sexual harassment is a reformulation of an argument raised by the dissenting justices in Vance—and quickly rejected by the majority in that case. See id. at 2451.